## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JAIR ANTONIO PEREZ MAZA,                )        CASE NO.:   1:22-cv-23325-XXXX
individually, and as PERSONAL           )
REPRESENTATIVE OF THE ESTATE            )
OF NURIS DEL CARMEN MAZA                )
BERTEL,                                 )
                                        )
       Plaintiffs,                      )
                                        )
    vs.                              )
                                        )
CONTINENTAL MOTORS INC D/B/A            )
CONTINENTAL MOTORS GROUP                )
                                        )
    and                              )
                                        )
CONTINENTAL MOTORS SERVICES,            )
INC.                                    )
                                        )
    and                              )
                                        )
PIPER AIRCRAFT, INC.                    )
                                        )
    and                              )
                                        )
PIPER AIRCRAFT CORPORATION c/o          )
THE PIPER AIRCRAFT                      )
CORPORATION IRREVOCABLE                 )
TRUST c/o HOWARD BERLIN                 )
TRUSTEE FOR THE PIPER AIRCRAFT          )
CORPORATION IRREVOCABLE                 )
TRUST                                   )
                                        )
       Defendants.                      )
                                        )

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

## BACKGROUND

1.     This action arises out of the October 13, 2020 crash of a Piper 28RT-201T aircraft, registration HK2533G ("subject aircraft"), due to failure of its Continental Motors engine (S/N 1003094) ("subject engine") while in flight in Colombia. Continental had serviced the engine only a few days prior, on approximately September 28, 2020. NURIS DEL CARMEN MAZA BERTEL was a passenger and killed in the crash.

## THE PARTIES

2.     Plaintiff, JAIR ANTONIO PEREZ MAZA, is an individual and resident of Colombia (address CC. 1.047.396.241, Barrio Lo Amador, Calle 36 #20B39, Cartagena, Colombia), and at all relevant times hereto, was and is the natural son of NURIS DEL CARMEN MAZA BERTEL, deceased.

3.     Plaintiff JAIR ANTONIO PEREZ MAZA is the PERSONAL REPRESENTATIVE of the ESTATE OF NURIS DEL CARMEN MAZA BERTEL, which is being administered in the Circuit Court for Miami-Dade County, Florida Probate Division (In Re: Estate of Nuris Del Carmen Maza Bertel, Deceased); Case No. 2022-005431-CP-02.

4.     Defendant CONTINENTAL MOTORS INC D/B/A CONTINENTAL MOTORS GROUP (hereinafter "CONTINENTAL MOTORS") is a Delaware Corporation that maintains its principal place of business at 2039 Broad Street, Mobile, Alabama 36615-1293.

5.     Defendant CONTINENTAL MOTORS SERVICES, INC. (hereinafter "CONTINENTAL SERVICES") is a Delaware Corporation that maintains its principal place of business at 2039 Broad Street, Mobile, Alabama 36615-1293.

6.     Defendants CONTINENTAL MOTORS and CONTINENTAL SERVICES are collectively referred to as "CONTINENTAL DEFENDANTS".

7. CONTINENTAL DEFENDANTS, and each of them, and / or its predecessors, manufactured and designed the original engine, selling it to PIPER defendants in this court's jurisdiction, and subsequently overhauled / remanufactured the original engine on approximately September 20, 2010. The newly remanufactured subject engine was then installed onto the subject aircraft on or about December 10, 2020.

8. CONTINENTAL DEFENDANTS, and each of them, and / or its predecessors subsequently maintained the subject engine in the United States, including in this district, up until approximately September 28, 2020, a few days prior to the crash. CONTINENTAL DEFENDANTS also inspected the subject engine subsequent to the crash, in the United States and, upon information and belief, in this judicial district. Despite Plaintiffs' requests to preserve the engine and evidence related to this crash, CONTINENTAL DEFENDANTS have not responded to requests to inspect the subject engine which was last in their possession.

9. PIPER AIRCRAFT, INC. (a/k/a, d/b/a or f/k/a New Piper Aircraft, Inc.) (hereinafter referred to as "NEW PIPER") is believed and therefore averred to be organized and existing under the laws of the State of Delaware, but whose principal place of business is in Vero Beach, Florida.

10. THE PIPER AIRCRAFT CORPORATION IRREVOCABLE TRUST (a/k/a, d/b/a, f/ka Piper Aircraft Corporation) (hereinafter "the PIPER TRUST") trust governed by Florida law that assumed the products liability and "future claims" liability of Piper Aircraft Corporation and exists to defend, resolve, litigate, adjust, settle, or otherwise manage the liability generated by Piper Aircraft Corporation from the design, manufacture, and sale of defective aircraft. For this purpose, the PIPER TRUST conducts its business from the offices of its Trustee in Miami, FL.

11.     Collectively, NEW PIPER and the PIPER TRUST shall be referred to as "PIPER DEFENDANTS".

12.     Because plaintiff has only recently learned of the failures of PIPER DEFENDANTS, with respect to defendant PIPER TRUST, plaintiff had no choice but to name it as a defendant herein while simultaneously going through the claims process in the Southern District of Florida.

13.     While PIPER DEFENDANTS assembled, designed, and manufactured the subject aircraft in approximately 1979, after purchasing and then installing the original engine from CONTINENTAL DEFENDANTS in Florida, PIPER DEFENDANTS, and each of them, after the September 2010 overhaul and December 2010 installation of the subject engine on the subject PIPER aircraft through present day, continuously failed to provide guidance or warnings alerting operators of low levels of lubrication/oil in a timely manner to avoid catastrophic failure, or procedures to quickly recognize and safely and reliably land the aircraft prior to its engine reaching a state of catastrophic failure, ultimately too late for most pilots to recover, including the pilot of the subject aircraft which killed plaintiffs' decedent herein.

14.     Plaintiff is informed and believes, and based upon such information and belief alleges that at all times relevant hereto, each Defendant, either directly or as a result of actions or inactions by one of its predecessors, was the owner, servant, agent, joint-venturer, employee or employer of each of its co-Defendants, and in doing the acts hereinafter mentioned, each Defendant was acting within the scope of its authority and with the permission and consent of its co-Defendants, and each of them, and that said acts of each Defendant was ratified by said Defendant's co-Defendants, and each of them and every Defendant, as aforesaid, when acting as a

principal, was negligent in the selection and hiring of each and every other Defendant as an agent, employee and/or joint venturer.

## JURISDICTION AND VENUE

15.     This is an action for damages in excess of the jurisdictional limits of this Court, exclusive of costs and interest and otherwise within the jurisdiction of this court.

16.     This Court has in personam jurisdiction over all defendants. All defendants do business within the State of Florida, by availing themselves to the business opportunities here, advertising the availability of parts and information, shipping parts and literature into the state, and receiving money from those businesses in this state who order goods, services, and parts, and pay for them.  In addition, defendants supply literature to aircraft owners located within the state, and to mechanics, fixed base operators, and others who perform aircraft maintenance in this state for purposes of providing information and knowledge as to parts that can be purchased from the defendants for the repair or replacement of aircraft and their components, including but not limited to the remanufacturer / overhaul of the engine by CONTINENTAL DEFENDANTS on or about September 20, 2010, on information and belief, in this judicial district, along with its subsequent installation in the subject aircraft on or about December 10, 2010.

17.     Up until a few weeks prior to the crash, the subject aircraft and subject engine were maintained by CONTINENTAL DEFENDANTS or authorized CONTINENTAL DEFENDANTS personnel in the United States and, upon information and belief, in this judicial district.

18.     CONTINENTAL DEFENDANTS also inspected the subject engine subsequent to the crash, in the United States and, upon information and belief, in this judicial district

19.     Jurisdiction is further proper as defendants, and each of them, routinely sell their products and services in and to Florida businesses and residents, as CONTINENTAL DEFENDANTS and/or their predecessors did herein with their contract with PIPER DEFENDANTS, which called for the purchase of CONTINENTAL engines, including the subject engine, by PIPER DEFENDANTS, and then the installation of said engines at PIPER DEFENDANTS' facilities in Florida, including installation in the subject aircraft, and then sale of the subject aircraft and other PIPER aircraft by PIPER DEFENDANTS in Florida.

20.     Defendants, and each of them, maintain systematic and continuous contacts with Florida and/or have registered agents here. Jurisdiction is proper under the Florida Long Arm Statute and the Due Process clause of the United States Constitution.

21.     Venue is proper in that each of the defendants regularly conduct business in this County and/or may be served here. Venue is further proper as the defendants regularly conduct business here and avail themselves to this County.

22.     Further, suit against PIPER TRUST defendants requires the filing of the complaint in this judicial district.

## FACTUAL BACKGROUND

23.     According the official investigation, during the execution of a VFR flight in the private aircraft Piper PA28RT HK2335G, subject aircraft, between the Simon Bolivar airport (SKSM) of Santa Marta, and the Guaymaral airport (SKGY) of Bogota D.C., after 02:33 flight hours, a malfunction of the subject engine occurred with a subsequent emergency declaration by the pilot.

24.     The investigation revealed the following series of events during the flight of the subject aircraft on October 13, 2000:

At 16:30 HL, communications were transferred to Bogota lnformacion (BOG FIC) and Pilate reported:
"... lateral to Barbossa responding at 6630...".
The ATC gave instructions to notify the Ubate position for a change.

At 16:39:16 HL (02:33 after takeoff), Pilate reported to ATC:
"...two three three five golf MAYDAY MAYDAY two three three five golf..."

At 16:39:25 HL (9 sec. after MAYDAY declaration), Pilate added to the frequency:
"... I have power problems, I have power problems two three three five golf..."
After crossing information with ATC to provide more flight information, the pilot reported being close to the town of Chiquinquira.

At 16:40:19 HL (01:03 min after MAYDAY), the Pilot reported to ATC:
"... I am going to try to approach Las Acacias with two three three five golf...".

At 16:41:32 HL, Pilate confirmed the estimated frequency of seventeen (17) minutes to Las Acacias.

At 16:44:35 HL, Pilate reported leaving the Ubate position and following that, at 16:44:47 HL, (05:09 min after MAYDAY declaration) reported:
. Received, I think .... (unintelligible) ... nothing ... because the oil pressure dropped, YWY well, I'm going, I'm moving ahead to see if I/ego Las Acacias ... "
The ATC instructed Pilato to notify the Guaymaral Surface frequency (GYM GND) in case of losing contact.

At 16:48:12 HL, (09:28 min after MAYDAY declaration), Pilate reported6:
"... Leaving Ubate, close to Ubate, I'm going to see if I can get to... Las Acacias, on two three three five golf, I have a loss of oil pressure... and smoke in the cabin... ".
At that time, the BOG FIC and GYM GND ATC units were alerted to the news and pending any request and information from aircraft HK2335G.

At 16:51:01 HL (12:17 min after MAYDAY declaration), the Pilot of aircraft HK2335G reported:
"... Engine failure on two three three five golf, engine fa/la...".
After this last communication, no further information was received from El Pilato regarding aircraft HK2335G.


25.     The pilot had attempted to make a forced landing in an unprepared field located

near the municipality of Ubate, Cundinamarca. During the maneuver, the subject aircraft collided

with trees, followed by impact with the ground, killing three people including the pilot and also

plaintiffs' decedent herein, and additionally causing injuries to a surviving infant traveling in the

plane. The trees it initially made contact with, the first impact with the ground, and the final position of the subject aircraft are shown below, from the investigative report:



26. During the investigation, the subject engine was transported to the United States, on information and belief within this judicial district, where representatives of CONTINENTAL DEFENDANTS inspected it, finding signs of engine failure, including but not limited to loss of oil resulting in a detonation event.

27. The investigation revealed, among other things, the following:

In the upper section of the engine, adjacent to the No. 2 cylinder and the fuel distributor, there was a fracture of the power casing, with a diameter of approximately 4 cm, and a linear fracture of 8 cm in length towards the engine gasket, with obvious oil spill.

Inspection of the engine revealed engine operation without lubrication, excessive friction, high temperature components, and rupture of the No. 1 and 2 connecting rod caps.

Piston No. 6 presented evidence of high temperature, with significant damage related to the melting of the material in one section, attributable to a detonation effect.

The actions of Pilate in command in response to the failure presented were carried out in accordance with the aircraft's Operations Manual.

The engine had the maintenance services required by the manufacturer and there was no evidence of non-compliance with Bulletins or Airworthiness Directives.

The hermetic failure of piston No. 6, due to the action of the detonation, caused the engine to become pressurized due to the entry of gases into the power crankcase, causing the oil to be expelled by pressure through the engine exhaust.

Metal particles and debris were found in the oil pan, which could have clogged and contaminated the oil supply necessary for effective lubrication and likely caused further engine damage.

The motor was found to be stiff to turn prior to disassembly. It is likely that rotation would have been even more difficult when the engine was warm and internal clearances were reduced. The damage quickly reached a level where engine operation was no longer possible.

28.     Plaintiffs have requested an inspection of the subject engine from CONTINENTAL DEFENDANTS but they have not provided either the location or permission to inspect it, and, upon information and belief, Plaintiffs believe the subject engine to be stored in this judicial district.

## DAMAGES

29.     As a direct and proximate result of defendants', and each of their actions and or inactions, NURIS DEL CARMEN MAZA BERTEL died in the crash, survived by her son, Plaintiff JAIR ANTONIO PEREZ MAZA.

30.     Plaintiffs hereby demand recovery under the applicable wrongful death and survival acts/statutes, for all recoverable compensatory damages, including but not limited to loss of net accumulations, pecuniary losses, conscious pain and suffering, medical expenses, pre-impact fear, severe emotional distress, loss of pecuniary benefits, loss of contributions for support, loss of parental, marital, and household services, loss of society and comfort, funeral expenses, and mental anguish resulting from the deaths of Plaintiffs' decedent.

31.     Plaintiffs demand all available remedies pursuant to the Florida Wrongful Death Act, F.S. §768, et seq. and the Florida Survival Act, F.S. §46.021. To the extent another state's

law is applied on the issue of damages, Plaintiffs demand all available remedies under such law. Plaintiffs request damages to be determined by a jury.

## COUNT I

### (STRICT LIABILITY)

### (Against the Continental Defendants)

32. Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

33. The Continental Defendants, and each of them, are in the business of designing, inspecting, testing, distributing, selling, supplying, overhauling, rebuilding, servicing, supporting, maintaining and/or repairing and selling aircraft engines, and are the type certificate holders and/or production certificate holders responsible for ensuring continuing airworthiness for the accident model aircraft engine.

34. The Continental Defendants, and each of them, designed, developed, manufactured, assembled, inspected, distributed, sold supplies, overhauled, rebuilt, serviced, supported, maintained, modified and/or repaired the accident aircraft engine and its component parts including the engine oil system and fuel delivery system as well as its indication systems, which were, defective and unreasonably dangerous, from the date of overhaul, September 10, 2010 through the date of the crash.

35. In addition the Continental Defendants sold the overhauled subject engine, and component parts to its first user to be installed in the subject aircraft. The dangerous defects which caused this accident existed at the time the overhauled subject engine and component parts were first sold by the Defendants.

36.     The overhauled subject engine and component parts were in the same condition at the time of the accident as they were when first sold, on or about December 2010.

37.     The dangerous defects, which included a failure to have everything necessary to make the aircraft safe, and which rendered the overhauled subject engine unreasonably dangerous were, but are not limited to:

       a.  An inability of the engine to properly function under all flight conditions;

       b.  Unreliable indications of engine parameters, including, but not limited to, oil pressure;

       c.  Improper selection of the powerplant;

       d.  Improper selection of the turbo charging system;

       e.  Improper design of the turbocharging system;

       f.  Improperly designing a turbocharging system that did not allow for a proper fuel air mixture to be delivered to the engine under all conditions;

       g.  Use of a turbocharger which was prone to failure and malfunction;

       h.  Use of a turbocharging system which, if it malfunctioned, would cause the engine to lose power;

       i.  Improper design and selection of the fuel delivery system;

       j.  Improper selection of engine components;

       k.  Improper warnings concerning loss of power;

       l.  Improper warnings concerning loss of oil pressure;

       m. Improper instructions concerning loss of power;

       n.  Improper instructions concerning loss of oil pressure;

       o.  Improper design and selection of the oil pressure transducer;

p.  Failure to ensure that fuel would be supplied under all conditions;

q.  Failure to properly test the subject engine;

r.  Failure to provide a means of restoring engine power;

s.  Failure to select a proper fuel delivery system;

t.  Improper and dangerous selection of the fuel pump;

u.  Improper design of the fuel pump;

v.  Failure to ensure the fuel pump functioned under all conditions;

w. Failure to select a boost pump capable of supplying adequate fuel to the engine;

x.  Failure to warn owners, pilots, operators and mechanics of the defects in the accident aircraft;

y.  Dangerous and defective design, manufacture, assembly and certification of the aircraft and its powerplant and associated components, including the overhauled subject engine and its component parts;

z.  Dangerous and defective failure to warn owners, pilots, operators and mechanics of the failures that could occur, including the severity of failure and urgent need to land as soon as possible; and

aa.    Other defects which will be determined.

38.    As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

## COUNT II

### (NEGLIGENCE)

### (Against the Continental Defendants)

39.     Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

40.     The Continental Defendants, and each of them, owed duties to the Plaintiffs to act as a reasonably prudent manufacturer, designer, and seller of the overhauled subject engine and associated components, and to ensure the airworthiness of the subject engine.

41.     In addition to the duties imposed by common law, these defendants were subject to duties imposed by regulatory law.

42.     The Continental Defendants, and each of them, breached their duties and were negligent, grossly negligent, and reckless by the virtue of the following:

a.      Failing to provide an overhauled engine which would properly function under all flight conditions;

b.      Failing to design and install proper indicators of engine parameters, including, but not limited to oil pressure;

c.      Improperly designing and manufacturing the powerplant and the overhauled subject engine;

d.      Improperly designing and manufacturing the turbo charging system and its components;

e.      Failing to properly design and manufacture the induction system;

f.      Improperly designing and selecting the fuel delivery system;

g.      Improperly selecting engine components and accessories;

h.      Failing to provide proper warnings concerning loss of power;

i.      Failing to provide proper warnings concerning loss of oil pressure;

j.      Failing to provide proper instructions concerning loss of power;

k.      Failing to provide proper instructions concerning loss of oil pressure;

l.      Failing to properly design and select the oil pressure transducer;

m.      Failing to ensure that fuel would be supplied under all conditions;

n.      Failing to properly design a turbocharging system such that it did not allow for a proper fuel air mixture to be delivered to the engine under all conditions;

o.      Failing to use a turbocharger which was not prone to failure and malfunction;

p.      Failing to use a turbo charging system which, if it malfunctioned, would not cause the engine to lose power;

q.      Failing to properly test the subject engine;

r.      Failing to provide a means of restoring engine power;

s.      Failing to design and select a proper fuel delivery and metering system;

t.      Selecting a dangerous and defective fuel pump;

u.      Failing to select a boost pump capable of supplying adequate fuel to the  engine;

v.      Failing to provide an overhauled engine and associated components which would be safe and fit for flight;

w.      Failing to provide an overhauled aircraft engine system that complied with regulations;

x.      Failing to warn owners, pilots, operators and mechanics of the failures that could occur and the severity of those failures, and the necessity to quickly land the airplane

y.      Failing to warn owners, pilots, operators and mechanics of the probability of failures;

z.      Failing to provide adequate maintenance and/or continuing airworthiness instructions, emergency procedures and warnings for the subject engine; and

aa. Other negligent acts which will be determined.

43.     As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

## COUNT III

### (BREACH OF CONTRACT)

### (Against the Continental Defendants)

44.     Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

45.     The pilot and operator of the subject aircraft bought the overhauled subject engine from CONTINENTAL DEFENDANTS, and each of them, for placement into the subject aircraft.

46.     In exchange for valuable consideration, the Continental defendants did agree to provide him an overhauled aircraft engine and component parts that would be safe and airworthy.

47.     Plaintiffs' decedent, as a passenger, was a third party beneficiary to this contractual agreement.

48.     CONTINENTAL DEFENDANTS breached the contract by failing to provide a safe and airworthy overhauled engine for the subject aircraft.

49.     As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

## COUNT IV

### (BREACH OF IMPLIED AND EXPRESS WARRANTIES)

### (Against the Continental Defendants)

50.     Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

51.     At all relevant times herein, the CONTINENTAL DEFENDANTS, and each of them, were and are now merchants engaged in the business of designing, manufacturing, selling, supplying, supporting, integrating, assembling, overhauling, and remanufacturing aircraft engines, including the subject engine and components as well as associated operation, repair, overhaul, installation and product support materials.

52.     CONTINENTAL DEFENDANTS, and each of them, described and advertised their goods and services for sale, including the overhauling of the subject engine and components. Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, order sheets, and other product statements.

53.     These descriptions and affirmations concerning the goods resulted in express warranties that the goods sold by the defendants were as described and safe for their intended use.

54.     In addition, these defendants provided an express warranty for the accident aircraft engine and component parts.

55.     These descriptions, representations, and affirmations resulted in oral and written express and implied warranties which regard the accident aircraft engine and component parts.

56.     Defendants expressly and impliedly warranted that the subject aircraft and its overhauled subject engine would operate safely.

57.     These descriptions, affirmations, and express warranties became part of the bases of the bargain of their sales and said warranties ran to Plaintiff as a third party beneificiary, as

passenger in the airplane operated and owned by the gentleman that defendants provided their warranties to.

58.     The purchaser further relied upon these warranties in operating and traveling in the subject aircraft.

59.     As a result of the sales activities of the Defendants, each and all of them, expressly and impliedly warranted that their individual goods were merchantable, fit for their ordinary purpose, properly labeled and packaged for sale and installation, and conformed to the promises and affirmations of fact made on their containers and labels. These implied warnings ran from Defendants to plaintiffs' decedent as a third party beneficiary passenger of the airplane.

60.     As a result of the sales activities of the Defendants, each and all them impliedly warranted that their goods were fit for their particular purpose, and each and all knew that their skill and judgment would be relied upon and were, in fact, relied upon by the purchaser of their individual goods.

61.     By selling defective goods, the Defendants breached their express warranties and the implied warranties of merchantability and fitness for particular purpose and the implied warranties arising from the course of dealings and usage of trade.

62.     As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

## COUNT V

### (STRICT LIABILITY)

### (Against the Piper Defendants)

63.     Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

64.     The Piper Defendants, and each of them, are in the business of designing, inspecting, testing, distributing, selling, supplying, overhauling, rebuilding, servicing, supporting, maintaining and/or repairing and selling aircraft, and are the type certificate holders and/or production certificate holders responsible for ensuring continuing airworthiness for the accident model aircraft.

65.     The Piper Defendants, and each of them, designed, developed, manufactured, assembled, inspected, distributed, sold supplies, overhauled, rebuilt, serviced, supported, maintained, modified, procured, required specs, installed and/or repaired the subject aircraft engine and its component parts including the engine oil system and fuel delivery system as well as its indication systems, which were, defective and unreasonably dangerous, from the date of overhaul, September 10, 2010 through the date of the crash.

66.     In addition the Piper Defendants bought or provided guidance on installation of the overhauled subject engine, and component parts to its first user to be installed in the subject aircraft.  The dangerous defects which caused this accident existed at the time the overhauled subject engine and component parts were first sold by the Defendants.

67.     The overhauled subject engine and component parts were in the same condition at the time of the accident as they were when first sold, on or about December 2010.

68.     The dangerous defects, which included a failure to have everything necessary to make the aircraft safe, and which rendered the overhauled subject engine unreasonably dangerous were, but are not limited to:

        bb.     An inability of the engine to properly function under all flight conditions;

        cc.     Unreliable indications of engine parameters, including, but not limited to, oil pressure;

dd.     Improper selection of the powerplant;

ee.     Improper selection of the turbo charging system;

ff. Improper design of the turbocharging system;

gg.     Improperly designing a turbocharging system that did not allow for a proper fuel air mixture to be delivered to the engine under all conditions;

hh.     Use of a turbocharger which was prone to failure and malfunction;

ii. Use of a turbocharging system which, if it malfunctioned, would cause the engine to lose power;

jj. Improper design and selection of the fuel delivery system;

kk.     Improper selection of engine components;

ll. Improper warnings concerning loss of power;

mm.     Improper warnings concerning loss of oil pressure;

nn.     Improper instructions concerning loss of power;

oo.     Improper instructions concerning loss of oil pressure;

pp.     Improper design and selection of the oil pressure transducer;

qq.     Failure to ensure that fuel would be supplied under all conditions;

rr. Failure to properly test the subject engine;

ss. Failure to provide a means of restoring engine power;

tt. Failure to select a proper fuel delivery system;

uu.     Improper and dangerous selection of the fuel pump;

vv.     Improper design of the fuel pump;

ww.     Failure to ensure the fuel pump functioned under all conditions;

xx.     Failure to select a boost pump capable of supplying adequate fuel to the engine;

yy.     Failure to warn owners, pilots, operators and mechanics of the defects in the accident aircraft;

zz.     Dangerous and defective design, manufacture, assembly and certification of the aircraft and its powerplant and associated components, including the overhauled subject engine and its component parts;

aaa.    Dangerous and defective failure to warn owners, pilots, operators and mechanics of the failures that could occur, including the severity of failure and urgent need to land as soon as possible; and

bbb.    Other defects which will be determined.

69.     As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

## COUNT VI

### (NEGLIGENCE)

### (Against the Piper Defendants)

70.     Plaintiffs incorporate the preceding and subsequent paragraphs as though fully set forth at length herein.

71.     The Piper Defendants, and each of them, owed duties to the Plaintiffs to act as a reasonably prudent manufacturer, designer, and seller of the overhauled subject engine's aircraft, and associated components, and to ensure the airworthiness of the subject aircraft.

72.     In addition to the duties imposed by common law, these defendants were subject to duties imposed by regulatory law.

73.     The Piper Defendants, and each of them, breached their duties and were negligent, grossly negligent, and reckless by the virtue of the following:

bb.     Failing to provide an overhauled engine which would properly function under all flight conditions;

cc.     Failing to design and install proper indicators of engine parameters, including, but not limited to oil pressure;

dd.     Improperly designing and manufacturing the powerplant and the overhauled subject engine;

ee.     Improperly designing and manufacturing the turbo charging system and its components;

ff.     Failing to properly design and manufacture the induction system;

gg.     Improperly designing and selecting the fuel delivery system;

hh.     Improperly selecting engine components and accessories;

ii.     Failing to provide proper warnings concerning loss of power;

jj.     Failing to provide proper warnings concerning loss of oil pressure;

kk.     Failing to provide proper instructions concerning loss of power;

ll.     Failing to provide proper instructions concerning loss of oil pressure;

mm.     Failing to properly design and select the oil pressure transducer;

nn.     Failing to ensure that fuel would be supplied under all conditions;

oo.     Failing to properly design a turbocharging system such that it did not allow for a proper fuel air mixture to be delivered to the engine under all conditions;

pp.     Failing to use a turbocharger which was not prone to failure and malfunction;

qq.     Failing to use a turbo charging system which, if it malfunctioned, would not cause the engine to lose power;

rr.     Failing to properly test the subject engine;

ss.     Failing to provide a means of restoring engine power;

tt.     Failing to design and select a proper fuel delivery and metering system;

uu.     Selecting a dangerous and defective fuel pump;

vv.     Failing to select a boost pump capable of supplying adequate fuel to the  engine;

ww.     Failing to provide an overhauled engine and associated components which would be safe and fit for flight;

xx.     Failing to provide an overhauled aircraft engine system that complied with regulations;

yy.     Failing to warn owners, pilots, operators and mechanics of the failures that could occur and the severity of those failures, and the necessity to quickly land the airplane

zz.     Failing to warn owners, pilots, operators and mechanics of the probability of failures;

aaa.     Failing to provide adequate maintenance and/or continuing airworthiness instructions, emergency procedures and warnings for the subject engine; and

bbb.     Other negligent acts which will be determined.

74.     As a direct and proximate result of the foregoing acts and omissions, plaintiffs suffered damages as alleged above.

WHEREFORE, plaintiffs demand judgment against all defendants for all damages permitted by law, and requests trial by jury of all issues triable as a right by a jury.

**JURY TRIAL DEMANDED**

Dated: October 13, 2022 **BRYANT LAW FIRM**

/s/ Justin K. Sanchez (for)

Randy A. Bryant (FBN: 157945)
5201 Blue Lagoon Drive | Suite 800
Miami, FL 33126
Tel: (305) 456-2777
Fax: (305) 675-6153
www.miamiprobatefirm.com

[AND]

**WILSHIRE LAW FIRM PLC**
A. Ilyas Akbari, Esq (CA Bar No. 228051)
(*pro-hac vice forthcoming*)
3055 Wilshire Blvd. | 12th Floor
Los Angeles, CA 90010
Tel: (213) 381-9988
Fax: (213) 381-9989
*ilyas@wilshirelawfirm.com*
*teamilyas@wilshirelawfirm.com*